*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0217p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____



JOSÉ TRINIDAD LOZA,

*Petitioner-Appellant,*

*v.*

No. 11-3453

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:98-cv-287—Edmund A. Sargus, Jr., District Judge.

Argued: December 5, 2012

Decided and Filed: September 2, 2014

Before: GIBBONS, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Laurence E. Komp, Manchester, Missouri, for Appellant. David M. Henry, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. Michael J. O'Hara, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Amicus Curiae. **ON BRIEF:** Laurence E. Komp, Manchester, Missouri, James A. Wilson, VORYS, SATER, SEYMOUR & PEASE LLP, Columbus, Ohio, for Appellant. David M. Henry, Thomas E. Madden, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. Michael J. O'Hara, O'HARA, RUBERG, TAYLOR, SLOAN & SERGENT, Covington, Kentucky, for Amicus Curiae.

GIBBONS, J., delivered the opinion of the court, in which GRIFFIN, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 46–48), delivered a separate opinion concurring in part and dissenting in part.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge.  In 1991, Jose Trinidad Loza shot and killed four members of his pregnant girlfriend's family.  An Ohio jury convicted him of four counts of aggravated murder, and he was sentenced to death.  Ohio state courts affirmed Loza's convictions and sentences on direct appeal and denied him post-conviction relief.  Loza filed a *habeas corpus* petition in federal district court, which was denied.  On appeal, Loza argues that he is entitled to *habeas* relief on seven grounds. We affirm the district court's denial of Loza's *habeas* petition.

**I.**

The Ohio Supreme Court described the facts and circumstances underlying Loza's convictions as follows:

> On January 16, 1991, defendant-appellant, Jose Trinidad Loza, shot four members of the family of his girlfriend, Dorothy Jackson.  The victims were shot in the head at close range while they slept in their home in Middletown, Ohio.  Loza shot Jackson's mother, Georgia Davis; her brother, Gary Mullins; and her two sisters, Cheryl (Mullins) Senteno and Jerri Luanna Jackson.  Mullins died almost immediately from his wound; Davis and Senteno survived several hours before dying.  Jerri Jackson, six months pregnant at the time of the shooting, died on January 31, 1991.

> On the afternoon of January 16, 1991, Gary Hoertt observed an individual in a white Mazda pick-up truck with California plates loading trash into his dumpster at his shop in Middletown.  Having had previous problems with the unauthorized use of his dumpster, Hoertt searched the dumpster for something with which to identify the individual.  Hoertt found a letter in the dumpster signed by Loza with a return address in Butler County.  Hoertt read the letter, the contents of which indicated that Loza was involved in a drive-by shooting in Los Angeles and that he came to Ohio to avoid apprehension by the Los Angeles police.

> After reading the letter, Hoertt called the Warren County Sheriff's Department to report his discovery.  Hoertt was informed that it would take some time before a deputy could respond.  During that time, Hoertt

was informed by an employee that the individual, later identified as Loza, and a female companion were seen in the vicinity of the nearby Greyhound bus station. Hoertt then called Middletown police detective Roger Knable.

After Knable arrived at Hoertt's shop and read the letter, Knable and Hoertt went to the dumpster, where they retrieved other items that Loza had discarded, which included: a knife; an empty box for a .25 caliber Raven automatic handgun; a receipt signed by a Judy A. Smith for the purchase of the handgun on January 15, 1991; a woman's purse; a blank check on the account of Georgia L. Davis; a general money order made payable to Jose Loza; clothing; and some other personal items.

As Hoertt and Knable were going through the items in Hoertt's office, Hoertt saw Loza approach the dumpster. Knable went to his cruiser and requested his dispatcher to notify Warren County deputies that the individual had returned and that he was going to speak to him. Knable identified himself as a police officer, approached Loza with his gun in his hand, and instructed Loza to place his hands on the front of the car. Knable searched Loza and asked his name. At this time, Loza identified himself as "Jose Rodriguez." Knable told Loza the reason he was being stopped was because of what he put in the dumpster. Loza responded "yes." Knable said the letter indicated that Loza may have been involved in a drive-by shooting in Los Angeles. Loza again responded "yes." Knable then informed Loza that he was going to handcuff him and hold him until Warren County deputies arrived. Knable then went to locate the woman who had been seen with Loza earlier. Loza said that the woman's name was Cynthia Rodriguez, that she was his wife, and that they were headed to California.

Knable then went inside the bus station and approached Dorothy Jackson. He asked her name and she responded "Dorothy Jackson." When asked, Jackson stated that Loza's name was "Jose Rodriguez," and that they were not married. Within a short time after Knable's initial contact with Loza, Warren County deputies arrived. The deputies determined Jackson was under age and that she planned to travel to California with Loza. When asked, Jackson gave her mother's telephone number to the deputies. Knable was unsuccessful in reaching Davis, Jackson's mother, by phone. Detectives Knable and George Jeffery then went to Davis's home at 1408 Fairmont, but did not receive any response when they knocked at the door. A neighbor approached the detectives and said that she had been trying unsuccessfully all day to get someone from the house to respond.

Because the police were unable to determine if Jackson had permission to travel out of state, she was arrested for being an unruly

minor and was taken to the Warren County Juvenile Detention Center. Loza was arrested for contributing to the delinquency or unruliness of a minor and was taken to the Warren County Justice Center.

When the detectives began questioning Jackson at the juvenile detention center, she did not initially tell them of the murders. Shortly into the questioning, she began crying. She said she did not want to go to jail, and that Loza had killed her family. Jackson then told the detectives what she knew about the murders.

Based upon Jackson's statement, Detective Knable obtained a search warrant for the house at 1408 Fairmont. When the police entered the house, they discovered the victims.

Knable and Jeffery then returned to the Warren County Justice Center and began questioning Loza. The detectives' interview with Loza was videotaped. At the beginning of the interview, Loza waived his *Miranda* rights. Initially, Loza said that he and Jackson were traveling to California with her mother's permission. The detectives told Loza they knew what had happened, and that it would be in his, Jackson's and the unborn baby's best interest if he just told the truth. About one hour into the interview, Loza confessed to the murders. Loza detailed the murders, including the order in which he shot the victims. Loza stated that Jackson was not in the house at the time of the murders, and that she did not know that he was going to kill her family members.

The detectives asked Loza when he began thinking about murdering Jackson's family members. Loza responded that he had been thinking about it since he had obtained the gun and particularly after Davis had threatened to have him arrested if he tried to leave the state with Jackson. Loza explained that he shot Davis because of her threats. When asked why he shot the others, he responded: "Knowing I had to do one, I had to do all. * * * Because if I only done one, they would have—they would have known it was me. If I would have done all of them, nobody would have found out."

*State v. Loza*, 641 N.E.2d 1082, 1091–92 (Ohio 1994).

In 1991, a jury convicted Loza of four counts of aggravated murder. It recommended that Loza be sentenced to death for the aggravated murders of Mullins, Senteno, and Jerri Jackson. It recommend that Loza be sentenced to thirty years' to life imprisonment for the aggravated murder of Davis. The trial court accepted the jury's recommendation.

The Ohio Court of Appeals and the Ohio Supreme Court affirmed Loza's convictions and sentences. *State v. Loza*, 641 N.E.2d 1082 (Ohio 1994); *State v. Loza*, No. CA 91-11-198, 1993 WL 120028 (Ohio Ct. App. April 19, 1993). The Ohio Supreme Court denied Loza's motion for reconsideration. *State v. Loza*, 643 N.E.2d 142 (1994) (table decision). The Butler County Court of Common Pleas denied Loza's petition for post-conviction relief, and the Ohio Court of Appeals affirmed. *State v. Loza*, No. CA 96-10-214, 1997 WL 634348 (Ohio Ct. App. Oct. 13, 1997). The Ohio Supreme Court declined discretionary review of Loza's appeal, stating that it posed no substantial constitutional question. *State v. Loza*, 689 N.E.2d 49 (Ohio 1998) (table decision).

Loza filed a petition for a writ of *habeas corpus* in federal district court, asserting thirty-four grounds for relief. The district court dismissed several of Loza's claims as procedurally defaulted. It denied Loza's remaining claims and dismissed the action. The district court certified fourteen issues for appeal, and this court granted a certificate of appealability on one additional issue. Loza raises seven of these issues on appeal. Loza abandoned the issues that he failed to raise, and we do not consider them. *Post v. Bradshaw*, 621 F.3d 406, 413–14 (6th Cir. 2010).

## II.

In an appeal of a § 2254 *habeas* action, we review the district court's legal conclusions *de novo*. *Cristini v. McKee*, 526 F.3d 888, 897 (6th Cir. 2008). "'[W]here the district court has made factual determinations based on its review of trial transcripts and other court records,'" we also review the district court's factual conclusions *de novo*. *Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006) (quoting *Mackey v. Russell*, 148 F. App'x 355, 359 (6th Cir. 2005)).

We review the decision of "the last state court to issue a reasoned opinion on the issue[s]" raised in a *habeas* petition. *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006); *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding

that judgment or rejecting the same claim [are presumed to] rest upon the same ground.").

Loza filed his petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). As a result, AEDPA governs our review. Under § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision is "contrary to" clearly established federal law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent." *Id.* at 405–06. A state court's decision is an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407–08. "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "The state court's application of clearly established law must be objectively unreasonable." *Id.* The phrase "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

A state court's factual determination is not "unreasonable" within the meaning of § 2254(d)(2) "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct. 841, 849 (2010). Even if "[r]easonable minds reviewing the record" might disagree about a factual finding, "on habeas review that does not suffice to supersede" the state court's determination. *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).

## III.

Loza argues that the Ohio Supreme Court unreasonably applied clearly established federal law when it held that the trial court properly refused to suppress statements that Loza made to Detective Knable shortly after Knable encountered Loza at Hoertt's trash bin on the day of his arrest.

On the day of Loza's arrest, Hoertt observed Loza putting items in the trash bin at Hoertt's shop. Hoertt searched the trash bin and found a letter in which the writer stated that he was involved in a drive-by shooting in Los Angeles. Hoertt contacted Knable, who arrived and read the letter. A short time later, the men saw Loza return to the trash bin. At the suppression hearing before the trial court, Knable explained what happened next:

> I went to my cruiser, my unmarked police car. I told the desk, my dispatcher, that the individual who had placed this stuff in the dumpster had returned to the dumpster, and was still in the area. I told them I was going to approach him, notify Warren County to respond immediately if possible. As I approached Mr. Loza, he turned to face my car. He had on a, I believe, a blue and gray jacket. It appeared to me as though he was reaching for his pocket. I got out of the car with my service gun to my side. I advised him I was a police officer. I did display a badge. I was not wearing a jacket. My badge was on my belt. I advised him to place his hands on the top—on the hood of the car, which he did. I then put my gun away, padded him down, and advised him that the reason why I wanted to speak with him was because of the stuff he put in the dumpster. I asked him his name, and he told me it was Jose Rodriguez.
>
> At that point, I told him Warren County Sheriff's Department was on the way—they wanted to speak with him in reference to the letter. I also, at that point, handcuffed him, placed him in the back of my car, told

him it would be approximately ten minutes before they arrived. At that time I asked him where his friend was, or female companion. He stated she was in the bus station.

Loza told Knable that Jackson's name was Cynthia Rodriguez. Knable further explained:

> [W]hen I first got up and started talking to him, I said, "The reason I'm stopping is because of what you put in the dumpster." And he said, "Yes." And I said, "This letter there indicates that you may have been involved in a shooting in Los Angeles. Again he said, "Yes." At that point I advised him that I was going to handcuff him, and hold him until Warren County arrived.

Prior to trial, Loza moved to suppress his statements to Knable. Loza argued that Knable's seizure of Loza violated the Fourth Amendment. He also argued that Knable failed to provide him with warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to questioning him, in violation of his Fifth Amendment privilege against self-incrimination. The trial court denied Loza's motion. At trial, Knable testified that Loza provided false names for himself and Dorothy Jackson. The State referenced this fact in opening and closing arguments.

The Ohio Supreme Court rejected Loza's argument that he was unlawfully seized. It concluded that Knable conducted a lawful investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). *Loza*, 641 N.E.2d at 1097–98. The court also rejected Loza's claim that his statements to Knable should have been suppressed:

> Appellant's contention that the statements he made to Knable after being stopped should be suppressed because he was not given *Miranda* warnings is baseless. Knable merely asked Loza his name and other general questions associated with a police investigation. This type of questioning is not affected by the Supreme Court's holding in *Miranda*.

*Id.* at 1098 (citation omitted).

Loza now argues that the Ohio Supreme Court unreasonably applied clearly established federal law when it failed to recognize that he was in custody at the time that

Knable questioned him and, consequently, that Knable was required to advise him of his *Miranda* rights.  Loza's argument implicates two constitutional doctrines.

First, the Self-Incrimination Clause of the Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend V.  In *Miranda v. Arizona*, the Supreme Court held that in order to protect the privilege against compelled self-incrimination, a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.  "An officer's obligation to administer *Miranda* warnings attaches . . . 'only where there has been such a restriction on a person's freedom as to render him 'in custody.'"  *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (*per curiam*)).  "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*) (internal quotation marks and citation omitted)).  The initial custody determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.  *Id.* at 323.

Additionally, the Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  In *Terry v. Ohio*, the Supreme Court held that when a law enforcement officer has a reasonable, articulable suspicion that a person may be involved in criminal activity, he may, consistent with the Fourth Amendment, conduct a brief investigatory stop of the person.  392 U.S. at 30–31.  Such a stop must be "justified at its inception" and "reasonably related in scope to the circumstances which justified the interference in the first place."  *Id.* at 20.  During the stop, the officer may make "reasonable inquiries"

of the person and conduct a pat-down search to check for weapons.  *Id.*  "Reasonable inquiries" include, for example, questions about a person's identity.  *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cnty.*, 542 U.S. 177, 186 (2004); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) (observing that if police have a reasonable suspicion that a person they encounter was involved in connection with a completed felony, then they may conduct a *Terry* stop to "ask questions[] or check identification"); *Hayes v. Florida*, 470 U.S. 811, 816 (1985) ("[I]f there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information."); *Adams v. Williams*, 407 U.S. 143, 146 (1972) (observing that, pursuant to *Terry*, an officer may make "[a] brief stop of a suspicious individual[] in order to determine his identity or to maintain the status quo momentarily while obtaining more information").

In *Berkemer v. McCarty*, the Supreme Court recognized that an individual may be detained, but nonetheless may not be "in custody" for purposes of *Miranda*.  468 U.S. 420, 337–39 (1984) (holding that roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute "custodial interrogation" for purposes of *Miranda*).  The Court remarked on "the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda."  *Id.* at 440.  It noted, by way of explanation, the "comparatively nonthreatening character" of such detentions.  *Id.* The Court explained that although "the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions . . . the detainee is not obliged to respond . . . [a]nd, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released."  *Id.* at 339–40 (footnotes omitted).

The Ohio Supreme Court's determination that Knable questioned Loza pursuant to a lawful *Terry* stop and, consequently, that Knable was not required to provide Loza with his *Miranda* rights was not unreasonable.  The court noted that Knable had a reasonable, articulable suspicion that criminal activity was afoot based on the letter

found in Hoertt's trash bin regarding a drive-by shooting. *Loza*, 641 N.E.2d at 1097. He also had reason to suspect that Loza, whom Hoett identified as the man who put the items in the trash bin, may have been involved. *Id.* In light of these facts, it was not unreasonable for the court to conclude that Knable, pursuant to *Terry*, permissibly approached Loza, patted him down, and asked him for his name and the name of his companion.

Loza argues that Knable's encounter with him was more coercive than a typical *Terry* stop. He notes that Knable was holding his firearm when he approached Loza and that he handcuffed Loza and placed him in the back of his patrol car. Courts and commentators have recognized that the line between investigatory stops governed by *Terry*—particularly those that are more intrusive—and custodial interrogations subject to *Miranda* is, at times, unclear. *See, e.g.*, *Cruz v. Miller*, 255 F.3d 77, 84 (2d Cir. 2001) ("[T]he [Supreme] Court has not explicitly considered what circumstances of a *Terry* stop would constitute 'custody' requiring *Miranda* warnings."); Michael J. Roth, *Berkemer Revisited: Uncovering the Middle Ground Between Miranda and the New Terry*, 77 Fordham L. Rev. 2779, 2779 (April 2009) (observing that the courts are divided as to whether *Miranda* applies during a valid, but intrusive *Terry* stop). However, to the extent that the law is not clearly established, the Ohio Supreme Court's decision was not unreasonable.[1]

For these reasons, Loza is not entitled to *habeas* relief on this ground.

**IV.**

Next, Loza argues that the Ohio Supreme Court's decision upholding the voluntariness and admissibility of his confession was based on an unreasonable

---

[1] Because we conclude that the Ohio Supreme Court's decision that Knable questioned Loza pursuant to a lawful *Terry* stop was not unreasonable, we do not address Loza's argument that Knable's questions did not fall under the exception to *Miranda* for "routine booking questions." *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (exempting from *Miranda*'s coverage "questions to secure the biographical data necessary to complete booking or pretrial services") (internal quotation marks and citation omitted).

determination of the facts and was contrary to or an unreasonable application of clearly established federal law.

After Dorothy Jackson implicated Loza in her family members' killings and police discovered the victims, Detectives Knable and Jeffery questioned Loza at the detention center where he was being held. At the beginning of the interview, which was videotaped, Loza waived his *Miranda* rights. After about an hour of questioning, Loza confessed to the killings. The trial court denied Loza's motion to suppress his confession, and the video of his confession was played at trial. The Ohio Supreme Court held that Loza's confession was voluntary and properly admitted.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life liberty, or property, without due process of law." U.S. Const. amend. XIV. "[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). In order to determine whether a confession was voluntarily made, a court must evaluate the totality of the circumstances surrounding the interrogation to determine whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). "[C]oercion can be mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). In addition to "the crucial element of police coercion," courts consider "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" and the failure of police to advise the defendant of his *Miranda* rights. *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (internal citations omitted); *see also Schneckloth*, 412 U.S. at 226 (discussing factors). If a defendant has been advised of his *Miranda* rights and voluntarily waived them, it will be difficult to claim that his confession was nonetheless involuntary. *Missouri v. Seibert*, 542 U.S. 600, 609 (2004) (plurality

opinion) (noting that "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina"); *see also Berkemer*, 468 U.S. at 433 n.20 ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.").

The Ohio Supreme Court examined the totality of the circumstances surrounding Loza's confession and upheld the trial court's denial of Loza's suppression motion, reasoning, in part:

> [W]e concur in the trial court's finding that the appellant's statements were voluntarily made and that the appellant's will to resist was not overborne by threats or improper inducements. Appellant was of majority age and was in command of his faculties at the time he confessed. He was not interrogated for an unreasonable length of time, and was not subjected to physical abuse or harsh conditions. We note that before the interrogation began, appellant waived his *Miranda* rights. Upon completion of the interrogation, when the detectives asked appellant if he felt threatened by them or if they had made any promises to him, appellant responded that "no," they had not threatened him, and agreed they had not made any promises to him. Through these affirmations, appellant has confirmed that his confession was voluntarily made.

*Loza*, 641 N.E.2d at 1095.

Loza first argues that the Ohio Supreme Court's decision was based on an unreasonable determination of the facts. He contends that the court's conclusion that "[n]o threats were made [during the interrogation] concerning [Dorothy] Jackson or what would happen if appellant did not confess," *Loza*, 641 N.E.2d at 1094, is contrary to the record.

Loza argues that Detectives Knable and Jeffery threatened Dorothy Jackson and Loza's unborn baby to coerce Loza into confessing. For example, the detectives asked Loza if he "want[ed] Dorothy to have her baby in a penitentiary" or if he wanted "[his] baby to be put up for adoption to somebody you've never heard of" and told Loza that "[t]hat's what's going to happen." At one point, the detectives implied that Loza was

not telling the truth and Knable said, "What you're trying to do is put yourself in an electric chair or a gas chamber right along with Dorothy, and this child is going to go off into never, never land and never be seen again." Loza argues that he interpreted this statement to mean that if he did not confess, Dorothy Jackson would be prosecuted, and both she and Loza's unborn child would be sent to the electric chair.

The Ohio Supreme Court rejected Loza's argument that these statements constituted threats, reasoning:

> The detectives' references to Jackson were made in response to appellant's repeated inquiries about what would happen to her. No threats were made concerning Jackson or what would happen if appellant did not confess. The detectives merely informed appellant of the possible consequences of his actions. By the time the detectives were questioning appellant, Jackson had already told the police about appellant's involvement in the murders. Appellant sought the release of Jackson and he initiated the bargaining for her release. Under these circumstances, the statements made to the detectives were voluntary beyond doubt.

*Loza*, 641 N.E.2d at 1094 (citations omitted).

After reviewing the video recording and transcript of Loza's interrogation, we conclude that the Ohio Supreme Court's determination that the detectives did not threaten Dorothy Jackson or Loza's unborn child was not unreasonable. The record supports the court's conclusion that "detectives merely informed appellant of the possible consequences of his actions" when they told Loza that both he and Dorothy Jackson could be imprisoned for their involvement in the killings. *Id.* It is unclear what Knable meant when he said that their child would go "into never, never land." However, it was not unreasonable for the court to characterize Knable's statement as an assessment of the possible consequences of Loza's actions, albeit phrased in hyperbolic terms. As the court noted, most of the detectives' references to Jackson during the interrogation were in response to Loza's questions about what would happen if Jackson were charged and prosecuted. Viewed in context, the detectives' comments do not appear to be threats. Even if we believed that some statements could be characterized as threats, our

mere disagreement is not enough to supersede the Ohio Supreme Court's factual determination on *habeas* review.  *See Rice*, 546 U.S. at 341–42.

Next, Loza argues that the Ohio Supreme Court's determination that his confession was voluntary is contrary to *Spano v. New York*, 360 U.S. 315 (1959), and *Lynumn v. Illinois*, 372 U.S. 528 (1963), two pre-*Miranda* cases in which the Supreme Court reversed defendants' convictions based on involuntary confessions.  In *Spano*, several officials questioned the defendant, a 25-year-old immigrant with only a half-year of high school education and a history of emotional instability, "for virtually eight straight hours before he confessed" to a killing.  360 U.S. at 322.  During the interrogation, police asked a "fledgling police officer" and close friend of the defendant to falsely tell the defendant that the officer could lose his job, leaving him unable to provide for his pregnant wife and three children.  *Id.* at 317–19.  The Court concluded that the defendant's "will was overborne by official pressure, fatigue and sympathy falsely aroused." *Id.* at 323.  In *Lynumn*, the defendant confessed to unlawful possession and sale of marijuana after officers told her that she would be sent to jail, her state financial aid would be cut off, and her children would be taken away.  372 U.S. at 533. The threats were made while the defendant was "encircled in her apartment by three police officers" and another man, a twice-convicted felon, who had "purportedly 'set her up.'"  *Id.* at 534.  The defendant had no previous experience with criminal law and "no reason not to believe that the police had ample power to carry out their threats."  *Id.* Thus, the Court concluded that the defendant's will was overborne.  *Id.*

The Ohio Supreme Court's determination that Loza's confession was voluntary is not contrary to *Spano* and *Lynumn*.  Loza suggests that the facts of his case are "materially indistinguishable," *Williams*, 529 U.S. at 405–06, from the facts of these cases, but this is incorrect.  First—and most importantly—*Spano* and *Lynumn* pre-dated *Miranda*.  Unlike the defendants in these cases, Loza was read his *Miranda* rights and voluntarily waived them,[2] making it very difficult for him to demonstrate that his confession was nonetheless involuntary.  *See Seibert*, 542 U.S. at 609; *Berkemer*,

---

[2]Loza does not argue that his waiver was involuntary.

486 U.S. at 433 n.20.  Second, other circumstances of Loza's interrogation distinguish it from the interrogations in *Spano* and *Lynumn*, including Loza's age, education level, the length of his interrogation, the environment in which he was interrogated, and the statements detectives made to him.  Even if individual facts are similar, the "totality of the circumstances" in Loza's case is not the same.  Thus, Loza's case was not so indistinguishable from these cases that the Ohio Supreme Court was required to arrive at the same result.

Loza argues that, as in *Spano* and *Lynumn*, his interrogators made threats about what would happen to other people if he did not confess.  However, as previously discussed, the Ohio Supreme Court's factual determination that the detectives' statements were not threats was not unreasonable.  Loza argues that, like the defendants in *Spano* and *Lynumn*, detectives lied to him when they falsely told him that they had spoken with Jerri Jackson, who was alive but unresponsive when police arrived at the Dorothy Jackson's family home.  However, this similarity does not compel a conclusion that Loza's confession was involuntary.  The Court has subsequently clarified that *Miranda* does not prohibit "mere strategic deception." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990).  "Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Id.*; *see also Frazier v. Cupp*, 394 U.S. 731, 739 (1969) (holding that police misrepresentation of facts, while relevant, was insufficient to render an otherwise voluntary confession inadmissible).  Loza also argues that detectives lied to him by promising that he would get to see Dorothy Jackson and that they would testify on his behalf if he confessed.  However, the record does not support Loza's assertion that the detectives lied about these issues.  The Ohio Supreme Court reasonably concluded that, although the detectives said they would try to make arrangements for Loza to see Dorothy Jackson, they explicitly said that they could not promise that a meeting would occur.  It also reasonably concluded that the detectives did not promise to testify on Loza's behalf or make any promises regarding the treatment he would receive from the court.

For these reasons, the Ohio Supreme Court's decision was not based on an unreasonable factual determination.  Nor was it contrary to or an unreasonable application of clearly established federal law.  Loza is not entitled to *habeas* relief on this ground.

## V.

Loza argues that the Ohio Supreme Court's decision upholding the trial court's exclusion of the testimony of Dr. Roger Fisher, a clinical psychologist, at the guilt phase of trial was contrary to and an unreasonable application of *Crane v. Kentucky*, 476 U.S. 683 (1986).  In *Crane*, the Supreme Court held that the "blanket exclusion" of evidence concerning the circumstances of the defendant's confession on the ground that it related only to voluntariness, not credibility, violated the defendant's right to present a complete defense.  *Id.* at 690–91.

Loza sought to introduce testimony from Fisher at the guilt phase of trial to help explain his confession.[3]  Loza's counsel stated that he expected Fisher to testify that "Loza's acknowledgment of his participation in the offense and his desire to take full responsibility would have been [the] product of psychological coercion and duress brought upon by the statements of the police officer that his girlfriend would be placed in the electric chair and this child would be sent to never-never land."  He said that he expected Fisher to testify that Loza's "letters and repeated affirmations of [his confession] would have been consistent with Mr. Loza's coerced desire to protect his girlfriend and unborn child."  The trial court prohibited Loza's counsel from introducing Fisher's testimony at the guilt phase of trial because it had already determined Loza's confession to be voluntary.  However, it permitted Fisher to testify at the mitigation phase, after the jury had found Loza guilty.  Fisher testified that Loza's father abandoned his family when he was five years old, which had a "very drastic" impact on Loza.  Fisher testified that when Loza met Dorothy Jackson, she "became the most important thing in Jose Loza's life."  Fisher explained that Loza saw Dorothy Jackson as "a chance

---

[3]Loza's counsel did not explicitly state whether Fisher's testimony was relevant to the voluntariness of Loza's confession or to its credibility.

to recover all that he had missed as a much younger, much more helpless child" and "to have his own family set up on his own terms which nobody could take away from him." Fisher opined, based on his viewing of Loza's confession, that Loza appeared to be "trying to take a lot of pressure to himself and avoid problems for his girlfriend." He stated that, in his opinion, Loza would have lied to protect Dorothy Jackson and that he would have done anything necessary to protect his unborn child. The Ohio Supreme Court affirmed the trial court's decision to exclude Fisher's testimony at the guilt phase.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation [C]lauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane*, 476 U.S. at 690 (internal quotation marks and citations omitted); *see also Chambers v. Mississippi*, 410 U.S. 284, 294 (1973) (observing that this opportunity includes "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf"); *Washington v. Texas*, 388 U.S. 14, 19 (1967) (stating that this opportunity includes "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary . . . [and] the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies").

However, "[a] defendant's right to present relevant evidence is not unlimited." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." *Id.* A defendant's right to present a complete defense is only violated "by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (internal quotation marks and citation omitted); *Scheffer*, 523 U.S. at 308; *Alley v. Bell*, 307 F.3d 380, 394 (6th Cir. 2002) ("[A] defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve.").

The Supreme Court has deemed unconstitutional several "arbitrary" rules—that is, "rules that excluded important defense evidence but that did not serve any legitimate interests." *Holmes*, 547 U.S. at 325. For example, in *Washington*, the Court held that the defendant's Sixth Amendment rights were violated when a state procedural statute barring co-participants in a crime from testifying on one another's behalf barred his accomplice's testimony that he had committed the crime with which Washington was charged. 388 U.S. at 16–17. The Court observed that the rule "[could not] even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury," because the rule permitted co-participants to testify in situations where the incentive to commit perjury was even greater than the situations in which they were banned. *Id.* at 22. In *Chambers*, the defendant called as a witness a man who had previously confessed to the murder with which Chambers was charged. 410 U.S. at 291. The man repudiated his confession on the stand, but Chambers was prohibited from examining him as an adverse witness or presenting witnesses who would have discredited his repudiation due to the state's "voucher" rule, which prohibited a party from impeaching his own witness. *Id.* at 291–92, 294–95. The Court noted that the State could not "defend . . . or explain" the rationale behind the "voucher" rule and held that "under the facts and circumstances of [the] case," the rule violated Chambers' due-process rights under the Fourteenth Amendment. *Id.* at 297, 303. *See also Rock v. Arkansas*, 483 U.S. 44, 61 (1978) (holding unconstitutional a *per se* rule prohibiting hypnotically refreshed testimony because the evidence constituted "an arbitrary restriction on the [defendant's] right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections").

*Crane*, the case on which Loza relies, is another example of the Court's rejection of an arbitrary rule. *See Holmes*, 547 U.S. at 326; *Alley*, 307 F.3d at 395. The defendant in *Crane* confessed to shooting and killing a liquor store clerk. 476 U.S. at 684. Prior to trial, Crane moved to suppress his confession on the ground that it was impermissibly coerced. *Id.* at 684–85. At the suppression hearing, Crane, who was sixteen years old at the time he was interrogated, testified that he was detained in a windowless room for a long period of time, that he was surrounded by as many as six police officers, that he

was repeatedly denied permission to call his mother, and that he was "badgered" into making a false confession. *Id.* at 685. The trial court found that Crane's confession was voluntary and denied the motion. *Id.* At trial, the prosecution moved *in limine* to prevent the defense counsel from introducing any testimony regarding the circumstances in which the confession was obtained. *Id.* at 685–86. Defense counsel argued that she did not intend to relitigate the issue of voluntariness by introducing evidence about the "physical and psychological environment in which the confession was obtained," but sought "only to demonstrate that the circumstances of the confession cast doubt on its validity and its credibility." *Id.* at 684, 686 (internal quotation marks and citation omitted). The trial court granted the prosecutor's motion. *Id.* at 686.

The Supreme Court held that "the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." *Id.* at 690. The Court noted that the trial court's ruling rested on the mistaken assumption that "evidence bearing on the voluntariness of a confession and evidence bearing on its credibility fall in conceptually distinct and mutually exclusive categories." *Id.* at 687. The Court emphasized that "'evidence surrounding the making of a confession bears on its credibility' as well as its voluntariness." *Id.* at 688 (quoting *Jackson v. Denno*, 378 U.S. 368, 386 n.13 (1964)). Thus, "regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness," a defendant may introduce the same evidence at trial "to convince the jury that the manner in which the confession was obtained casts doubt on its credibility." *Id.* at 689. The Court acknowledged that judges have "wide latitude" to exclude evidence that is repetitive, marginally relevant, or poses an undue risk of harassment, prejudice or confusion. *Id.* at 689–90. It also acknowledged the power of states to exclude evidence through the application of evidentiary rules that "serve the interests of fairness and reliability." *Id.* at 690. However, the Court noted that "neither the Supreme Court of Kentucky in its opinion, nor respondent in its argument to this Court, has advanced any rational justification for the wholesale exclusion of this body of potentially exculpatory evidence." *Id.* at 691. Therefore, the Court reversed Crane's conviction. *Id.* at 692.

The Supreme Court later remarked that *Crane* did "*not* set[] forth an absolute entitlement to introduce crucial, relevant evidence" at a criminal trial. *Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (plurality opinion). It explained:

> Our holding that the exclusion of certain evidence in that case violated the defendant's constitutional rights rested not on a theory that all competent, reliable evidence must be admitted, but rather on the ground that the Supreme Court of Kentucky's sole rationale for the exclusion (that the evidence did not relate to the credibility of the confession) was wrong. *Crane* does nothing to undermine the principle that the introduction of relevant evidence can be limited by the State for a valid reason . . . .

*Id.*

Loza argues that the Ohio Supreme Court's decision upholding the exclusion of Fisher's testimony was contrary to and an unreasonable application of *Crane*. The Ohio Supreme Court reasoned:

> The testimony of Dr. Fisher is clearly outside the holding of *Crane*. The testimony of the witnesses in *Crane* related to how the physical and psychological environment of the interrogation could have impacted the voluntariness and credibility of the confession. Dr. Fisher's proffered testimony relates to how Loza's individual, psychological makeup, independent of the circumstances surrounding the interrogation, could have impacted the voluntariness and credibility of the confession. Consequently, *Crane* does not require the admission of Dr. Fisher's testimony.
>
> The jury was able to accurately consider the credibility and weight of the confession by watching it on videotape. They could see and hear the tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation. The jury had the opportunity to evaluate the credibility of the appellant and to give the confession its appropriate probative weight. Because the trial court already had ruled on the voluntariness of the confession and the jury had the opportunity to evaluate the credibility of the confession, the trial court did not abuse its discretion by excluding the testimony of Dr. Fisher during the guilt phase of the trial.

*Loza*, 641 N.E.2d at 1094 (citations omitted).

As an initial matter, we observe that the Ohio Supreme Court's reasoning is somewhat flawed. First, the Ohio Supreme Court implied that evidence of a defendant's mental state is not relevant to the credibility of a defendant's confession. This is not the case. The Court in *Crane* noted that the improperly excluded testimony concerned "the physical and psychological environment in which [Crane's] confession was obtained." 476 U.S. at 684. *Crane* provides no basis for distinguishing between evidence concerning external factors (such as the time and place at which a defendant was interrogated) and internal factors (such as a defendant's unique psychological characteristics) that bear on the credibility of a confession. Just as a defendant's personal characteristics are relevant to determining the voluntariness of a confession, *see, e.g.*, *Blackburn*, 361 U.S. at 206, so too are they relevant to the credibility of a confession. Next, the Ohio Supreme Court cited the fact that "the trial court already had ruled on the voluntariness of [Loza's] confession" as a valid reason for excluding Fisher's testimony at the guilt phase of trial. *Loza*, 641 N.E.2d at 1094. *Crane* explicitly states that "the circumstances surrounding the taking of a confession can be highly relevant to two separate inquiries, one legal [voluntariness] and one factual [credibility]." *Crane*, 476 U.S. at 688. Thus, the fact that the trial court had ruled on the voluntariness of Loza's confession did not provide a basis for excluding Fisher's testimony, to the extent that it was relevant to credibility.[4]

Nonetheless, the fact that aspects of the Ohio Supreme Court's reasoning were flawed does not mean that the court's decision was contrary to or an unreasonable application of clearly established federal law.

> A state-court decision is "contrary to" our clearly established precedents if it "applies a rule that contradicts the governing law set forth in our cases" or it if confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

---

[4]Nonetheless, the Ohio Supreme Court's mention of voluntariness in its discussion is understandable. At trial, Loza's counsel said that Fisher would testify that Loza's confession was the "product of psychological coercion and duress," language that suggests Loza's counsel intended to dispute the voluntariness of Loza's confession, not its credibility. The Ohio Supreme Court perhaps believed it should reiterate that Fisher's testimony could not have been introduced to contest voluntariness at trial.

> Avoiding these pitfalls does not require citation of our cases—indeed, it does not even require *awareness* or our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.

*Early v. Packer*, 537 U.S. 3, 8 (2003). "[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (*per curiam*); *see also Hurtado v. Tucker*, 245 F.3d 7, 20 (1st Cir. 2001) ("The ultimate question on habeas . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable . . . . [E]ven a poorly reasoned state opinion does not mean that the outcome represents an unreasonable application."); *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997) ("It doesn't follow that the criterion of a reasonable determination is whether it is well reasoned. It is not. It is whether the determination is at least minimally consistent with the facts and circumstances of the case.").

The Ohio Supreme Court's decision that Fisher's testimony was properly excluded was not contrary to or an unreasonable application of clearly established federal law. The "clearly established Federal law," § 2254(d)(1), at issue is that a defendant's right to present a complete defense is violated "when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the purposes it is designed to serve." *Alley*, 307 F.3d at 394; *see also Holmes*, 547 U.S. at 324; *Scheffer*, 523 U.S. at 308. *Crane* presents one such arbitrary rule: a "blanket exclusion" of testimony about the circumstances of a defendant's confession on the ground that it is related to voluntariness, not credibility. *See Crane*, 476 U.S. at 690. *Crane* does not stand for the proposition that all crucial, relevant evidence must be *admitted*, but only that it must not be *excluded* solely on the basis of this rule. *Egelhoff*, 518 U.S. at 53.

The Ohio Supreme Court did not apply a "mechanistic, per se" rule that evidence concerning the circumstances of Loza's confession had to be excluded because it related to voluntariness, not credibility. *Alley*, 307 F.3d at 394. Rather, it "made an individual determination [that Fisher's testimony was properly excluded] . . . based on the facts specific to [Loza's] case." *Id.* Specifically, after referring to *Crane*, it clearly and in

detail noted the evidence in the record other than Dr. Fisher's testimony pertaining to credibility.  The Ohio Supreme Court noted that the trial court had determined Loza's confession to be voluntary, but it also observed that Loza was permitted to present other evidence bearing on the credibility of his confession.  It stated that the jury had the opportunity to view the videotape of Loza's confession, observe the "tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation." *Loza*, 641 N.E.2d at 1094.  Thus, it "had the opportunity to evaluate the credibility of the appellant and to give the confession its appropriate probative weight." *Id.*  Loza argues that Fisher's testimony would have provided the jury with additional evidence about Loza's psychological characteristics that would have helped it weigh the credibility of his confession. Although this may be true, the Ohio Supreme Court reasonably concluded that *Crane* did not *require* this evidence to be admitted.[5]

The Ohio Supreme Court's decision is properly characterized as a determination that, given the ample evidence going to credibility, the *Crane* rule did not require Dr. Fisher's testimony, a rule embodying the principle that "the introduction of relevant evidence can be limited by the state for a valid reason." *Egelhoff*, 518 U.S. at 53.  In short, the Ohio Supreme Court did not exclude Dr. Fisher's testimony arbitrarily.  Thus, the Ohio Supreme Court's decision was not contrary to or an  unreasonable application of *Crane*, and Loza is not entitled to *habeas* relief on this ground.

## VI.

Loza argues that the Ohio Court of Appeals's decision that Loza's trial counsel was not ineffective for failing to adequately investigate and present evidence regarding Loza's cultural background and family history was based on an unreasonable

---

[5]The district court observed that the Ohio Supreme Court could have held that the trial court properly excluded Fisher's testimony under Ohio's rules of evidence, which prohibit expert witnesses from offering opinions as to the truthfulness of a witness's statement. *Loza v. Mitchell*, 705 F.Supp.2d 773, 791 (S.D. Ohio 2010) (citing *State v. Boston*, 545 N.E.2d 1220 (Ohio 1989), *overruled on other grounds by State v. Dever*, 596 N.E.2d 426 (Ohio 1992)).  The parties dispute whether Fisher's testimony could have been excluded on this basis.  We decline to consider this issue, which is not necessary to resolve the question before us.

determination of the facts and was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), which sets forth the standard assessing ineffective assistance claims.

Prior to trial, Loza's trial counsel requested funds to travel to Los Angeles to investigate Loza's background and family history. Loza's trial counsel stated their intent to review Loza's medical, educational, juvenile court, and employment records, in addition to speaking with Loza's family, priest, neighbors, police officers, and others. Loza's trial counsel also requested funds to hire a mitigation specialist to investigate Loza's case. The trial court granted both motions.

At the guilt phase of trial, Loza's trial counsel attempted to introduce the testimony of Fisher, the clinical psychologist, in order to explain the psychological characteristics that would have influenced Loza's confession. The court excluded this testimony. At the mitigation phase of trial, Fisher testified about Loza's abandonment by his father and his experience living with his sister in Mexico until they could join their mother, who was working to support them in the United States. Fisher described the racism and violence that Loza encountered in Los Angeles and his loose affiliation with gangs. Fisher also explained some of the psychological factors underlying Loza's relationship with Dorothy Jackson, including his strong desire to have his own family. Fisher opined that Loza's confession was consistent with Loza's desire to protect Dorothy Jackson and his tendency to "switch into that super-mach, super grown-up, super-tough guy persona where he takes all the blame."

Loza's trial counsel also presented testimony from several of Loza's family members at the mitigation phase of trial. Beatriz Loza, Loza's mother, said that after Loza's father left her for another woman, she went to the United States to find work and paid a smuggler to bring her children into the United States. She said that as a child, Loza was picked on because he was perceived to be different. Viviana Loza, Loza's sister, described Loza's anger at their father and Loza's desire to have a big family so that he could pass his name on to his children and restore the family name. Viviana Loza said that her mother instilled in them the importance of sticking by one's family.

Finally, Samantha Ceja, Loza's seven-year-old half-sister, testified that Loza was her favorite brother and that he gave her a pet rabbit and dolls before he left Los Angeles.

In Loza's petition for post-conviction relief in state court, Loza argued that his trial counsel was ineffective. He argued that his trial counsel failed to consult a cultural expert who could have testified regarding the cultural factors influencing Loza's confession and provided the jury with information on Mexican culture that could have helped it contextualize mitigation evidence from Loza's family. Loza supported this claim with affidavits from his trial counsel stating that they did not contact the Mexican consulate in connection with Loza's case because they had never worked with a Mexican client. Loza presented an affidavit from Susan Keefe, a professor of anthropology, opining that "[i]t would be consistent with Mr. Loza's Mexican values" to confess to the killings in order to protect his girlfriend and baby and that "[a] real Mexican man would respond to threats against his family, protect his family at all costs, and stand his ground in the most difficult circumstances." He also presented the affidavit of Julia Hawood, a clinical psychologist, who explained how machismo, "the cultural concept of Mexican manliness," influenced Loza.

Loza also argued that his trial counsel failed to present additional mitigating evidence from Loza's family. He presented affidavits from his mother, Viviana Loza, and family members who did not testify at trial—his grandmother, Emma Rodes; his sister, Beatriz Loza[6]; and his brother, Jesus Loza. Loza's mother's affidavit contained more information about Loza's past. She explained that he was beaten by teachers and children at his school in Mexico, that he was a sickly child, and that Dorothy Jackson previously became pregnant by Loza but miscarried the baby. Viviana Loza also stated that Loza was picked on in school in Mexico and the United States, that he was a sickly child, and that he was slow in learning to speak. Rodes, who was Loza's primary caretaker when he was a child, stated that Loza had asthma and bronchitis as a child and that he was beaten by his mother's boyfriend. Rodes said that in high school, Loza once "took all the blame" for friends who were caught stealing stereos. Finally, Jesus Loza's

---

[6]Loza's mother and sister share the same name.

affidavit stated that Loza was once attacked by members of a gang that he refused to join and that he later affiliated with a different gang, one that "did not engage in drive-by shootings," strictly "for social purposes."

The Butler County Court of Common Pleas denied Loza's petition for relief, and the Ohio Court of Appeals affirmed.

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. The Sixth Amendment right to counsel is "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). In order to demonstrate ineffective assistance of counsel, a defendant must make two showings: deficient performance and prejudice. *Strickland*, 466 U.S. at 687.

First, the defendant must demonstrate that his counsel's performance was deficient. *Id.* He must do so by showing that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 688).

"A counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005) (citing *Wiggins*, 539 U.S. at 522–23.). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. "In assessing whether a defendant's counsel was ineffective at [a] mitigation hearing for failing to

introduce certain evidence, the focus must be on whether the investigation supporting counsel's decision not to introduce mitigating evidence of the defendant's background was itself reasonable." *Clark*, 425 F.3d at 284 (citing *Wiggins*, 539 U.S. at 523). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

Second, the defendant must demonstrate that counsel's deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. When a defendant challenges a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*

Establishing that a state court's application of *Strickland* is unreasonable under § 2254(d) is a "difficult" task. *Harrington*, 131 S.Ct. at 788.

> The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (internal quotation marks and citations omitted).

The Ohio Court of Appeals concluded with respect to Loza's ineffective assistance of counsel claim:

> The record contains evidence that Loza's trial counsel offered evidence that Loza confessed to "protect" Jackson and his unborn child during the guilt and mitigation phases of Loza's trial. During the guilt phase of the trial, Loza's trial counsel sought to introduce the testimony of Dr. Roger Fisher, a clinical psychologist. The proffered testimony was that Loza confessed because "his background, psychological makeup, and his personal code of conduct required that he not snitch and that he protect Dorothy." The trial court excluded this testimony during the guilt phase of the trial and the Ohio Supreme Court upheld this ruling on direct appeal. However, Dr. Fisher's testimony was allowed during the mitigation phase of the trial. Since Keefe's "cultural evidence" is merely cumulative of or alternative to Dr. Fisher's testimony, Loza has failed to establish ineffective assistance of counsel. Finally, Loza argues that his trial counsel was ineffective for failing to present mitigating evidence from Loza's family. In support of this argument, Loza submitted affidavits from his grandmother, sister, and brother. However, the record reveals that Loza's mother and two of his other sisters testified about Loza's family history and general character during the mitigation phase of his trial. Since the affidavits submitted by Loza are merely cumulative to the evidence presented at trial, he has failed to establish ineffective assistance of counsel. Accordingly, Loza's claims of ineffective assistance of counsel are without merit, and his second assignment of error is overruled.

*Loza*, 1997 WL 634348, at *4 (citations omitted).

Loza argues that the Ohio Court of Appeals's decision was based on an unreasonable determination of the facts. First, he contends that the court erred by concluding that the testimony provided by Fisher, a psychologist, was similar to testimony that would have been offered by a cultural expert such as Keefe. This factual determination was not unreasonable. At the mitigation phase of Loza's trial, Fisher testified about Loza's difficult childhood and its effect on Loza's outlook. Keefe's affidavit discussed largely the same facts, but from a slightly different angle. Keefe explained Loza's actions as a product of his cultural heritage, while Fisher attributed them to Loza's psychological make-up. For example, Keefe opined that Loza confessed to protect Dorothy Jackson and his unborn baby, consistent with his image of "[a] real

Mexican man." Fisher said essentially the same thing, testifying that Loza's confession was consistent with his desire to protect Dorothy Jackson and his tendency to "switch into that super-mach, super grown-up, super-tough guy persona where he takes all the blame." In light of this and other similarities, the court's factual determination was not unreasonable. Second, Loza argues that the court failed to consider the affidavits of Hawood and Loza's trial counsel. But the fact that the Ohio Court of Appeals did not mention these pieces of evidence in its opinion does not mean that it did not consider them. Nothing in the court's opinion suggests that it failed to do so. Loza cannot demonstrate that the court's decision was based on an unreasonable determination of the facts.

Next, Loza argues that Ohio Court of Appeals unreasonably applied *Strickland* because it failed to identify and analyze its requirements for proving an ineffective assistance of counsel claim. However, "a state court need not cite or even be aware of [the Supreme Court's] cases" as long as its decision is not contrary to or an unreasonable application of clearly established federal law. *Harrington*, 131 S. Ct. at 784; *Early*, 537 U.S. at 8. The fact that the court's analysis was less than explicit does not mean that its decision was unreasonable.

Finally, Loza argues that the Ohio Court of Appeals unreasonably concluded that Loza's failure to present additional evidence from a cultural expert and Loza's family members at the mitigation phase of trial was not deficient and did not prejudice Loza because the evidence was cumulative. "Our cases reject a requirement that any later-identified cumulative mitigating evidence must have been introduced in order for counsel to be effective." *Clark*, 425 F.3d at 286 (holding that counsel was not deficient for failing to present additional evidence regarding petitioner's family history); *see also Smith v. Mitchell*, 348 F.3d 177, 200 (6th Cir. 2003) (holding that counsel was not deficient and that petitioner was not prejudiced because "virtually all of the mitigating elements that [petitioner] complains of" were presented). "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at

sentencing." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).  Here, as in *Hill*, the evidence Loza contends should have been presented "resembles the evidence the jury did have before it in weighing the aggravating and mitigating factors."  *Id.*  The testimony of Keefe and Hawood resembles Fisher's testimony that Loza confessed to protect his girlfriend and unborn baby, consistent with his idea of manhood and personal code of conduct.  The testimony of Rodes, Beatriz Loza, and Jesus Loza resembles the testimony of Loza's mother, Viviana Loza, and Ceja that Loza suffered hardships as a child, was taunted and abused, and valued family, of which he was protective.  "Nothing in this new testimony suggests that it would have stood out to the jury in such a way as to change the calculation the jury previously made when weighing the aggravating and mitigating circumstances of the murder[s]."  *Hill*, 400 F.3d at 319.

For these reasons, the Ohio Court of Appeals's decision that Loza's trial counsel was not ineffective was not based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law.  Loza is not entitled to *habeas* relief on this ground.

## VII.

Loza argues that the Ohio Supreme Court unreasonably applied clearly established federal law when it held that the trial court's charge to the jury did not coerce the jury's verdict.

On the third day of deliberations, the jury submitted a question to the court: "To whom it may concern[:] We the jury would like to have clarified, how to decide a verdict on a specification to a count when a unanimous decision cannot be reached?  The jury instructions have not made this clear to us."  The trial court issued the following supplemental instruction and charge:

> Again, a word of caution, ladies and gentlemen.  After you've commenced your deliberations, it's important that the Court chooses its words carefully and that you refrain from any remarks that may affect the rights of either party to this action or which may disclose your opinion as a member of the jury.  We realize that this is a new and a difficult assignment for you and the process of discussion and deliberation in the

jury room is necessarily slow and requires consideration and patience. The secrecy which surrounds your efforts presents—prevents others, including the Court, from knowing when your efforts will result in a verdict. Now, I received the following note from the foreman, which says, "We the jury would like to have clarified how to decide a verdict on a specification to a count when a unanimous decision cannot be reached. The jury instructions have not made this clear to us."

The Court recognizes, ladies and gentlemen, the amount of time that you have spent and you've diligently applied yourself to attempting to resolve the numerous matters that are brought to your attention by way of verdicts in this case, the verdict forms. And that you have—You started your deliberations on Tuesday afternoon and here it is late Thursday morning and you have deliberated some over sixteen and a half hours, according to my calculations; and obviously there are still problems here with arriving at a conclusion.

Now, with respect to this specific inquiry, if the jury is unable to agree on a—to a verdict on a particular specification, as that is my understanding of this note, and you have exhausted all reasonable efforts to resolve your differences and you are convinced that further deliberations on that specification would not serve a useful purpose, the foreman shall note on the form, the verdict form, that particular specification, that the jury is unable to agree on a verdict on that specification, and sign the form as foreman. You will then proceed to the next verdict form as instructed on the bottom of the form, which you've just signed.

Now, I have some comments here that may be of some assistance. The principal mode provided by our constitution and laws for deciding questions of fact in criminal cases is by jury verdict. In a large proportion of cases, absolute certainty cannot be attained or expected. Although the verdict must reflect the verdict of each individual juror and not mere acquiescence in the conclusions of your fellows, each question submitted to you should be examined with proper regard and deference to the opinions of others. You should consider it desirable that this case be decided. You're selected in the same manner and from the same source as any future jury would be. There's no reason to believe that the case will ever be submitted to a jury more capable, impartial or intelligent than this one. Likewise, there's no reason to believe that more or clearer evidence will be produced by either side. It is your duty to decide the case if you can conscientiously do so. You should listen to one another's arguments with a disposition to be persuaded. Do not hesitate to reexamine your views and change your position if you are convinced that it is erroneous. If there is disagreement, all jurors should reexamine their positions given that a unanimous verdict has not been

reached.  Jurors who favor a particular verdict should consider whether their doubt is reasonable.  Considering that it is not shared by others, whether their doubt or conviction is reasonable, considering it's not shared by others equally honest, you've heard the same evidence with the same desire to arrive at the truth and under the same oath.  Likewise, jurors for a different verdict should not—should ask themselves whether they might not reasonably doubt the correctness of a judgment not concurred in by all other jurors.  Now, bearing in mind these admonitions and these matters that we bring forth, I'm going to ask you now to return and—or resume your deliberations.

The jury returned its verdict later that day.

The Ohio Supreme Court rejected Loza's argument that the trial court erred by giving the charge to the jury:

> The supplemental charge that the trial court gave was previously approved in *State v. Howard* [537 N.E.2d 188 (Ohio 1989)], paragraph two of the syllabus.
>
> After deliberating for a protracted period of time, the jury asked for clarification on how to decide a specification if a unanimous verdict could not be reached.  The court advised the jury to exhaust all reasonable efforts to reach a unanimous verdict, gave the *Howard* charge, and told the foreman to note on the verdict any failure to reach a unanimous verdict.  After continuing its deliberations for several more hours, the jury reached a unanimous verdict.
>
> Because the trial court gave a supplemental instruction that was previously approved by this court, appellant's twenty-third proposition of law is without merit.

*Loza*, 641 N.E.2d at 1104.

As an initial matter, Loza argues that AEDPA's deferential standard of review does not apply to this claim.  First, he contends that the Ohio Supreme Court decided his claim on the basis of state law and, therefore, it did not adjudicate his federal claim "on the merits" for purposes of § 2254(d).  Loza is incorrect.  The Ohio Supreme Court cited its decision in *Howard* holding that the jury charge from *Allen v. United States*, 164 U.S. 492 (1896), is unduly coercive but approving another instruction, the *Howard* charge, that "avoids the pitfalls of the traditional *Allen* charge."  *Ohio v. Howard*, 537 N.E.2d

188, 193 (Ohio 1989).  The fact that the Ohio Supreme Court cited its previous decision analyzing this constitutional issue, as opposed to reciting the analysis again, does not mean that it decided this issue on the basis of state law.  *See Early*, 537 U.S. at 8 (applying § 2254(d) to petitioner's claim where the California Court of Appeals relied on California Supreme Court decisions—which imposed even greater restrictions on jury instructions than *Allen*—in the course of rejecting petitioner's claim that the trial court's jury instructions were coercive).  Second, Loza contends that the Ohio Supreme Court failed to identify and explain controlling federal law.  As previously discussed, "a state court need not cite or even be aware of [the Supreme Court's] cases" in order for AEDPA deference to apply.  *Harrington*, 131 S. Ct. at 784; *Early*, 537 U.S. at 8.  Thus, the Ohio Supreme Court's decision is entitled to deference under § 2254(d).

When a jury is deadlocked, a trial court may give a supplemental instruction encouraging the jury to reach a verdict if possible.  *See Allen*, 164 U.S. at 501–02.  The constitutionality of an "*Allen*" or "dynamite" charge turns on whether the charge is coercive.  *See Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988).  In order to determine whether a jury was coerced, "we consider the supplemental charge given by the trial court 'in its context and under all the circumstances.'"  *Id.* at 237 (quoting *Jenkins v. United States*, 380 U.S. 445 (1965) (*per curiam*)).  The *Howard* charge is "no more coercive than the *Allen* charge."  *Brown v. Bradshaw*, 531 F.3d 433, 437 (6th Cir. 2008).  "As in *Allen* and *Lowenfield*, the [*Howard* charge] merely encourage[s] the jurors to consider each other's views and to ask themselves whether their own views [are] reasonable under the circumstances."  *Id.*

Loza does not challenge the language of the *Howard* charge, but, rather, he argues that it was inappropriate for the trial court to give it.  Loza interprets the jury's note as a request for guidance on how to fill out the verdict forms related to the  death penalty specifications.  He concedes that the trial court properly instructed the jury on this point, but he contends that the trial court erred by also giving the *Howard* charge, which was not responsive to the jury's request.

The jury's note is ambiguous. It could be interpreted as requesting guidance on how to resolve a deadlock or simply asking how to indicate this deadlock on the verdict forms. The Ohio Supreme Court interpreted the jury's note as a request "for clarification on how to decide a specification if a unanimous verdict could not be reached." *Loza*, 641 N.E.2d at 1104. Given the ambiguity of the note, the Ohio Supreme Court's factual determination that the jury was asking for guidance on how to resolve a deadlock was not unreasonable. *See* 28 U.S.C. § 2254(d)(2). The Ohio Supreme Court did not unreasonably apply clearly established federal law in determining that the *Howard* charge was appropriate under the circumstances of this case. We decline to grant *habeas* relief on this ground.

## VIII.

Loza argues that the Ohio Court of Appeals unreasonably applied clearly established federal law when it rejected his claim that he was selectively prosecuted for capital offenses based on invidious racial discrimination.[7] *Amicus*, the Government of Mexico, also argues in support of Loza's claim.

Loza raised his selective prosecution claim in state post-conviction proceedings. He filed a motion to conduct discovery on the allegedly discriminatory enforcement of the death penalty in Butler County. The Butler County Court of Common Pleas denied Loza's motion. The Ohio Court of Appeals ruled that the court properly denied Loza's motion because he could not meet the requirements for discovery on a selective prosecution established in *United States v. Armstrong*, 517 U.S. 456 (1996).[8] *Loza*, 1997

---

[7] Loza's claim, as presented to the district court, contained four sub-parts. Loza argued that: (1) he was selectively charged with capital offenses due to pervasive racism in Butler County, Ohio; (2) the death penalty is disproportionately imposed on Hispanics in Ohio; (3) he was denied a representative jury from a fair cross-section of the community; and (4) racial minorities were excluded from the jury at his trial. The district court granted a certificate of appealability as to the entire claim, but Loza raises only the first sub-part on appeal. He has abandoned the other arguments, and we do not consider them. *Bradshaw*, 621 F.3d at 413–14.

[8] In order to obtain discovery from the Government on a selective prosecution claim, a defendant must present "some evidence tending to show the existence of the essential elements of the [selective prosecution] defense"—discriminatory effect and discriminatory intent. *Armstrong*, 517 U.S. at 469 (internal quotation marks and citation omitted). The Ohio Court of Appeals held that Loza did not present any evidence of discriminatory effect because the general statistics on race and sentencing that he presented were insufficient to demonstrate that race affect the prosecution of *his* case. *Loza*, 1997 WL

WL 634348, at *7. The court also denied his selective prosecution claim on the merits. Loza raised his selective prosecution claim again in his *habeas* petition. The district court granted Loza's motion for leave to conduct discovery on the claim. The district court considered the new evidence that was produced[9] and denied Loza's selective prosecution claim.

The district court issued its decision in Loza's case prior to the Supreme Court's decision in *Cullen v. Pinholster*, — U.S. —, 131 S. Ct. 1388 (2011). In *Pinholster*, the Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400. *Pinholster* emphasized that "district courts are precluded from conducting evidentiary hearings to supplement existing state court records when a state court has issued a decision on the merits with respect to the claim at issue." *Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013). In *Harrington*, the Court clarified the meaning of "on the merits," stating: "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784–85. Loza's selective prosecution claim was adjudicated on the merits in state court and, therefore, *Pinholster* requires us to consider only the evidence that was before the state court when reviewing Loza's claim.

---

634348, at *5.

[9]This new evidence included depositions of Knable, officers in the Middletown Police Department, and the prosecutors at Loza's trial. During his deposition, Knable admitted that on a video of the crime scene, he could be heard referring to Loza as a "wetback from California." The new evidence also included the affidavit of Janet Dickens, a social worker who helped place Dorothy Jackson in foster care, and a report by Dickens. The report stated that Dorothy Jackson's foster mother expressed concern to Dickens about the girl. According to the foster mother, Dorothy Jackson "had admitted to [the foster mother's grandson that] she did kill her mother." Loza presented a copy of the report with a stamp indicating that it was received by the Butler County Prosecuting Attorney's Office in June 1992 while Loza's case was on direct appeal. Loza deposed the prosecutors on appeal, who denied having seen the report and said that if they had been aware of it, they would have disclosed it to Loza pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), which requires prosecutors to disclose exculpatory evidence to the accused. Loza claims that he did not discover Dickens's report until he conducted discovery on this claim in federal court.

Loza argues that he tried to develop his claim in state court, but the state court denied him an evidentiary hearing, which he claims violated his due process rights. Loza compares his case to *Panetti v. Quarterman*, 551 U.S. 930 (2007). In *Panetti*, the Supreme Court held that the state court unreasonably applied clearly established federal law when it failed to follow the procedural requirements established in *Ford v. Wainwright*, 477 U.S. 399 (1986), for determining the competency of a prisoner to be executed. *Panetti*, 551 U.S. at 948. The Court held that because the state court's adjudication of the petitioner's incompetency claim resulted from its failure to follow the procedures established in *Ford*, the state court's ruling on this claim was not entitled to AEDPA deference. *Id.* Loza's case is distinguishable from *Panetti*. Loza does not demonstrate that Ohio Court of Appeals's decision that he did not satisfy the requirements for an evidentiary hearing on a selective prosecution claim was contrary to or an unreasonable application of *Armstrong*. There is no indication that the court's ruling violated Loza's rights. *Panetti* does not provide a reason for refusing to accord AEDPA deference to the Ohio Court of Appeals's decision.

Loza also argues that the State failed to provide him with *Brady* material.[10] As a result, he says, the state court did not have the benefit of this evidence when it ruled on his selective prosecution claim. In *Brown v. Smith*, we held that a *habeas* claim has not been "adjudicated on the merits" when "new, substantial evidence supporting [the] claim comes to light during the proceedings in federal district court," and, therefore, the state court's decision is not entitled to AEDPA deference. 551 F.3d 424, 429 (6th Cir. 2008). However, as several unpublished decisions of this court have recognized, it is unlikely that *Brown* remains good law in light of *Pinholster* and *Harrington*. *Preslesnik*, 709 F.3d at 561–62; *see also Moritz v. Lafler*, No. 12-1222, 2013 WL 1777127, at *8 n.5 (6th Cir. Apr. 25, 2013); *Williams v. Lafler*, 494 F. App'x 526, 529 (6th Cir. 2012). Therefore, we conclude that the state court adjudicated Loza's claim on the merits, and

---

[10]Dissenting in *Pinholster*, Justice Sotomayor noted that the majority's opinion does not foreclose the possibility that "[t]here may be situations in which new evidence supporting a claim adjudicated on the merits gives rise to an altogether different claim"—for example, when evidence withheld by a prosecutor relating to one claim gives rise to a separate claim under *Brady*. 131 S.Ct. at 1417 n.5. We need not consider this issue because Loza has not raised a *Brady* claim. He simply points to an alleged violation that caused evidence to be "new" to him in his *habeas* proceeding.

we apply AEDPA's deferential standard of review, and consider only the evidence that was before the state court when reviewing Loza's claim.

We now turn to the merits of Loza's claim. "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *Armstrong*, 517 U.S. at 463. Prosecutors possess "'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)). As a result, prosecutorial decisions enjoy a "'presumption of regularity.'" *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14 (1926)). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (footnote omitted).

Nonetheless, prosecutorial discretion is not "unfettered." *United States v. Batchelder*, 442 U.S. 114, 124–25 (1979). The decision to prosecute cannot be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Wayte*, 470 U.S. at 608 (internal quotation marks and citations omitted). A criminal defendant bears the burden of proving that his prosecution violated equal protection standards. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'" *Armstrong*, 517 U.S. at 465 (quoting *Chemical Foundation, Inc.*, 272 U.S. at 14–15). This standard is demanding. *Id.* at 463. A defendant must demonstrate that the prosecutorial policy "'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Id.* at 465 (quoting *Wayte*, 470 U.S. at 608)). In a case where a defendant alleges unlawful discrimination based on race, he "must show that similarly situated individuals of a different race were not prosecuted" in order to establish discriminatory effect. *Id.*; *accord McCleskey*, 481 U.S. at 292.

The Ohio Court of Appeals rejected Loza's selective prosecution claim, stating:

> Loza argues that since Jackson, who is Caucasian, was similarly situated and not prosecuted for murder, he has established a claim of selective prosecution. However, unlike Loza, Jackson was a juvenile at the time that the murders were committed. Further, since the amount of evidence implicating Loza was significant and substantial, there was a race-neutral explanation for the prosecutor's decision. Therefore, Loza failed to show that the decision to prosecute him for murder was based upon his race and the trial court properly dismissed his sixth claim for relief.

*Loza*, 1997 WL 634348, at *5 (citations omitted).

The Ohio Court of Appeals's decision was not unreasonable. Loza argues that he was similarly situated to Dorothy Jackson, but that she was not prosecuted for murder.[11] He contends that the fact that Jackson was a juvenile who was ineligible for the death penalty does not establish that she was not similarly situated to Loza. Even if we accepted this argument, Loza ignores the "significant and substantial" evidence implicating him in the killings, including his confession and Dorothy Jackson's statement to investigators that Loza killed her family. No such evidence implicated Dorothy Jackson in the killings. The court's determination that Loza and Jackson were not similarly situated and, therefore, that Loza could not demonstrate the discriminatory effect necessary to succeed on his selective prosecution claim, was not unreasonable.

Loza argues that the decisionmakers in his case acted with discriminatory purpose and, therefore, he is entitled to relief on this claim. First, Loza references statistical data included in his petition for post-conviction relief in state court that the death penalty is disproportionately imposed in Butler County, Ohio on defendants who are racial minorities and kill white victims. However, such general statistical evidence is insufficient to establish discriminatory purpose. *McCleskey*, 481 U.S. at 286, 292–97

---

[11]Loza also argues that he and Dorothy Jackson was treated differently in other ways. For example, he claims that employees at the juvenile detention center where Dorothy Jackson was held laundered her clothes before they were sent for forensic analysis but that Loza's clothes were not laundered. For purposes of our analysis, we do not ask whether Dorothy Jackson was treated differently from Loza. We ask whether she was similarly situated to Loza and whether authorities nonetheless unreasonably failed to prosecute her for the same crime.

(holding that a study indicating that black defendants and defendants charged with killing white people are more likely to receive the death penalty was insufficient to support an inference that the decisionmakers in petitioner's case acted with discriminatory purpose); *see also Keene v. Mitchell*, 525 F.3d 461, 464 (6th Cir. 2008) (rejecting petitioner's argument based on statistical evidence of racial disparities in capital indictments in the county in which petitioner was tried because the petitioner offered no evidence demonstrating purposeful discrimination in his own case); *Coleman v. Mitchell*, 268 F.3d 417, 441–42 (6th Cir. 2001) (acknowledging statistical evidence of "extremely troubling" racial disparities in the imposition of the death penalty in Ohio but holding that under *McCleskey*, this evidence is not enough to demonstrate selective prosecution).

Loza also argues—based on evidence from the evidentiary hearing in district court, which we do not consider—that the decisionmakers in his case, specifically Knable, were motivated by a discriminatory purpose. In *Armstrong*, the Supreme Court expressly rejected the argument that when a defendant demonstrates discriminatory purpose, he need not establish discriminatory effect to succeed on a selective prosecution claim. *Armstrong*, 517 U.S. at 467–68; *see also Cornwell v. Bradshaw*, 559 F.3d 398, 411 (6th Cir. 2009) (emphasizing that under *McCleskey* and *Armstrong*, a defendant must prove both discriminatory purpose and effect). Both showings are required. The Ohio Court of Appeals reasonably concluded that Loza's failure to show discriminatory effect meant that he could not succeed on his claim. Loza is not entitled to *habeas* relief on this ground.

## IX.

Finally, Loza argues that he is entitled to *habeas* relief because officials failed to inform him after his arrest that he had a right to contact the Mexican consulate pursuant to the Vienna Convention on Consular Relations ("Vienna Convention"). The Government of Mexico also argues in support of this claim.

Loza raised this argument in state post-conviction proceedings. The Ohio Court of Appeals rejected his argument:

Pursuant to [Ohio Rev. Code § 2953.21(A)(1)], postconviction relief is dependent upon a showing that "there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States." Thus, a petitioner is not entitled to postconviction relief unless he shows a violation of rights that are constitutional in dimension, which occurred at the time that he was tried and convicted.

Pursuant to the Supremacy Clause of the United States Constitution, federal statutes and treaties are the supreme law of the land. Thus, a treaty has been deemed to be the substantial equivalent of a federal statute. However, rights under a treaty and rights under a federal statute are not the equivalent of constitutional rights.

*Loza*, 1997 WL 634348, *1–2 (citations and footnote omitted). The court agreed with the Fourth Circuit's conclusion in *Murphy v. Netherland*, 116 F.3d 97 (4th Cir. 1997), that "[e]ven if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to setting out the rights and obligations of signatory nations), it certainly does not create *constitutional* rights." *Id.* at *2 (quoting *Murphy*, 116 F.3d at 100)). Therefore, it held that "Loza's claim did not constitute a substantive ground that entitled him to postconviction relief" under Ohio law. *Id.*

The Ohio Court of Appeals did not adjudicate Loza's claim "on the merits," and, consequently, AEDPA deference does not apply to our analysis. The Ohio Court of Appeals reasoned that under Ohio law, post-conviction relief is available only for violations of the state and federal constitutions, and Loza's Vienna Convention claim did not implicate constitutional rights. If a state court does not reach the merits of a petitioner's claim, "federal habeas review is not subject to the deferential standard that applies under AEDPA." *Cone v. Bell*, 556 U.S. 449, 472 (2009). "Instead, the claim is reviewed *de novo*." *Id.*; *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (applying *de novo* review where state courts did not reach *Strickland*'s prejudice prong); *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) ("[W]e give fresh review to [petitioner's] federal claim because the state courts addressed only his state law grounds for relief, which means they did not adjudicate the federal claim on the merits.") (internal citations, quotation marks, and alterations omitted).

A federal court may grant *habeas* relief to a prisoner who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The Vienna Convention is "a seventy-nine article, multilateral treaty that governs the establishment of consular relations between nations and defines the functions of a consulate." *United States v. Emuegbunam*, 268 F.3d 377, 388 (6th Cir. 2001). Both the United States and Mexico are signatories to the Vienna Convention. Vienna Convention on Consular Relations, art. 36, Apr. 24, 1963, 21 U.S.T. 77, 313, 369 [hereinafter *Vienna Convention*]. In 1969, the United States ratified the Vienna Convention and the Optional Protocol Concerning the Compulsory Settlement of Disputes to the Vienna Convention ("Optional Protocol"), Apr. 24, 1963, 21 U.S.T. 325 [hereinafter *Optional Protocol*]. *Medellin v. Texas*, 552 U.S. 491, 499 (2008). The Optional Protocol provides that disputes regarding the interpretation or application of the Vienna Convention "'shall lie within the compulsory jurisdiction of the International Court of Justice ["ICJ"]' and 'may accordingly be brought before the [ICJ] . . . by any party to the dispute being a Party to the present Protocol.'" *Medellin*, 552 U.S. at 499 (quoting *Optional Protocol*, 21 U.S.T. at 326). The ICJ is the "principal judicial organ of the United Nations." *Id.* (quoting United Nations Charter, art. 92, 59 Stat. 1051, T.S. No. 993 (1945)).

Article 36 of the Vienna Convention provides that "if a person detained by a foreign country 'so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State' of such detention, and 'inform the [detainee] of his righ[t]' to request assistance from the consul of his own state."[12] *Medellin*, 552 U.S. at 499 (quoting Vienna Convention, 21 U.S.T. at 101). In 2003, Mexico instituted proceedings against the United States before the ICJ, alleging that the United States violated the Vienna Convention in the cases of Mexican nationals—including Loza—who committed crimes in the United States when authorities failed to inform them of their right to contact the consulate following their arrests. *Case Concerning Avena and Other Mexican Nationals (Mexico v. U.S.)*, 2004

---

[12]"Under the language of the treaty, the 'sending State' is the nation of the arrested foreign national, and the 'receiving State' is the arresting nation." *Emuegbunam*, 268 F.3d at 396 n.3.

I.C.J. 12, 19, 39 (Mar. 31) [hereinafter *Avena*].  In March 2004, the ICJ held that the United States violated the Vienna Convention[13] and that the Mexican nationals were entitled to review and reconsideration of their convictions and sentences.  *Id.* at 70–73.  Shortly after the ICJ's decision, the United States withdrew from the Optional Protocol.  *Medellin*, 552 U.S. at 500.  Additionally, President George W. Bush issued a memorandum to the Attorney General stating "that the United States would 'discharge its international obligations' under *Avena* 'by having State courts give effect to the decision.'" *Id.* at 498 (citation omitted).

The Supremacy Clause provides that "all Treaties made . . . under the Authority of the United States, shall be the supreme Law of the Land."  U.S. Const. art. VI cl. 2. " Under federal law treaties have the same legal effect as statutes." *Emuegbunam*, 268 F.3d at 389.  However, "[a]s a general rule . . . international treaties do not create rights that are privately enforceable in the federal courts." *Id.*; *see also Head Money Cases*, 112 U.S. 580, 598 (1884) ("A treaty is primarily a compact between independent nations.  It depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it.  If these fail, its infraction becomes the subject of international negotiations and reclamations . . . . [T]he judicial courts have nothing to do and can give no redress.").  Even international agreements that directly benefit private persons "'generally do not create private rights or provide for a private cause of action in domestic courts.'" *Emuegbunam*, 268 F.3d at 389 (quoting *Restatement (Third) of the Foreign Relations Law of the United States* § 907, cmt. a (1987)).

The Supreme Court has expressly declined to decide whether Article 36 of the Vienna Convention creates individual rights that are enforceable in domestic courts.  *See Medellin*, 552 U.S. at 506 n.4 ("[W]e thus assume, without deciding, that Article 36 grants foreign nationals an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by

---

[13]With respect to Loza, specifically, the ICJ held that the United States failed to inform Loza of his rights and failed to notify the Mexican consulate of Loza's detention. *Avena* at 54–55.

authorities of the availability of consular notification.") (internal quotation marks and citation omitted); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 343 (2006) ("[W]e find it unnecessary to resolve the question whether the Vienna Convention grants individuals enforceable rights . . . . [W]e assume, without deciding, that Article 36 does grant . . . such rights."); *Breard v. Greene*, 523 U.S. 371, 376 (1998) (stating that the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest").

However, we and other circuit courts hold that "the Vienna Convention does not create a right for a detained foreign national to consult with the diplomatic representatives of his nation that the federal courts can enforce." *Emuegbunam*, 268 F.3d at 394; *see also Gandara v. Bennett*, 528 F.3d 823, 829 (11th Cir. 2008) ("[T]he announced rule is that the Vienna Convention does not confer enforceable individual rights."); *Cornejo v. Cnty. of San Diego*, 504 F.3d 853, 863 (9th Cir. 2007) ("[W]e hold that Article 36 does not unambiguously give [a foreign national] a privately enforceable right to be notified."); *United States v. Jimenez-Nava*, 243 F.3d 192, 198 (5th Cir. 2001) (stating that the defendant's argument "fails to lead to an ineluctable conclusion that Article 36 creates judicially enforceable rights . . . . Thus, the presumption against such rights ought to be conclusive."). *But see Jogi v. Voges*, 480 F.3d 822, 835–36 (7th Cir. 2007) (holding that Article 36 does create individually enforceable rights). Moreover, the Supreme Court held in *Medellin* that the ICJ's decision in *Avena* is not of its own force binding law that can be enforced in domestic courts and that President Bush's memorandum did not make the decision binding. *Medellin*, 552 U.S. at 498–99; *see also Garcia v. Texas*, 131 S. Ct. 2866, 2867 (2011) ("[W]e held [in *Medellin*] that neither the *Avena* decision nor the President's Memorandum purporting to implement that decision constituted directly enforceable federal law.").

For these reasons, Loza is not entitled to *habeas* relief on the ground that authorities violated his rights under the Vienna Convention.

**X.**

We **AFFIRM** the district court's dismissal of Loza's petition for *habeas corpus*.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree with the majority except with respect to Loza's argument under *Crane v. Kentucky*, 476 U.S. 683 (1986), as to which I respectfully dissent. The majority holds that although the Ohio Supreme Court misapplied *Crane*, its decision was not contrary to, and did not involve an unreasonable application of, *Crane* because in deciding to affirm the exclusion of Fisher's testimony, the court considered that the jury was able to view the taped confession in evaluating its credibility, and thus did not apply a mechanistic or per se rule in violation of *Crane*. I cannot agree.

*Crane* held that absent a valid state justification, the blanket exclusion of competent evidence bearing on the credibility of a confession violates the defendant's right to present a complete defense. *See Crane*, 476 U.S. at 690–91. *Crane* involved the same prohibition invoked here–the court had already determined that the confession was voluntary and on that basis excluded Fisher's testimony concerning the reliability of the confession. *See State v. Loza*, 641 N.E.2d 1082, 1093 (Ohio 1994) ("[T]he trial court concluded that since it had already made a pretrial determination that Loza's confession was voluntary, Dr. Fisher's testimony was not appropriate during the guilt phase."). The Ohio Supreme Court failed to acknowledge that excluding the testimony was error, and, in fact, relied on the same reason in affirming the trial court. *Id.* (noting in its decision to affirm that "the trial court already ruled on the voluntariness of the confession").

It would seem that this case is squarely governed by *Crane*. However, the majority characterizes the relevant question of clearly established federal law as whether the state court applied an "arbitrary, mechanistic, or per se" rule to affirm the exclusion of Fisher's testimony. Although the Supreme Court has described the rule applied in *Crane*, and here, as "arbitrary," *see Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) ("Another arbitrary rule was held unconstitutional in *Crane* . . . ."), the majority finds that because the Ohio Supreme Court did not apply *Crane*'s arbitrary rule

*mechanistically*, it made no error cognizable on habeas review.

This determination is flawed. If the relevant question is whether the state applied an arbitrary, mechanistic, *or* per se rule, then the fact that the Ohio Supreme Court applied *Crane*'s arbitrary rule should be enough to establish a constitutional violation resulting from an unreasonable application of *Crane*. By forgiving application of the arbitrary rule because the Ohio Supreme Court did not apply the rule mechanistically, or in a per se fashion, the majority moves its own benchmark.

More to the point, however, the Ohio Supreme Court's discussion of the jury's ability to view the videotape of Loza's confession did not make its application of the *Crane* rule to exclude Fisher's testimony any less arbitrary. In summarizing the evidentiary value of the videotape, the Ohio Supreme Court noted that by watching it the jury could "see and hear the tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation." *Loza*, 641 N.E.2d at 1094. If Loza were claiming simply that his confession was coerced by the police, the Ohio Supreme Court's observation might have force. But the manner in which the interrogation was conducted has no bearing on Loza's credibility defense. Loza did not seek to argue to the jury that he confessed because of factors relating to the physical circumstances of his confession, e.g., that he was physically intimidated or questioned for long hours in a small space. Rather, Loza sought to explain to the jury through Fisher's testimony that he confessed because his particular psychological makeup and personal history made him uniquely susceptible to the officers' statements about the potential harm to Dorothy Jackson and his unborn child if he did not confess, and that making a false confession would be consistent with his psychological and personal history. The trial court's evidentiary ruling denied him the opportunity to present evidence in support of *that* defense—his sole explanation for his purportedly false confession—during the guilt phase of trial, and the Ohio Supreme Court affirmed without identifying a valid reason to exclude the evidence.

Accordingly, because the trial court excluded Fisher's testimony for the reason condemned in *Crane* and for no other valid reason, and the Ohio Supreme Court failed

to recognize and, in fact, repeated the error, I cannot agree with the majority's determination that the Ohio Supreme Court decision was not contrary to or an unreasonable application of *Crane*.